# Mott et al. v. Willman et al.

(Decided December 17, 1929.)

(As Modified on Denial of Rehearing February 28, 1930.)

DYSARD & MILLER and BANNON & BANNON for appellants.

MARTIN & SMITH for appellees.

OPINION OF THE COURT BY COMMISSIONER HOBSON—Reversing.

The will of Minnie K. Gallagher was duly probated in the Boyd county court. Appellants prosecuted an appeal to the circuit court. On the trial of the case in the circuit court, there was a majority verdict of the jury against the will. The court granted a new trial on the ground that he had erred in submitting the question of undue influence to the jury. The case was tried again, and there was a majority verdict in favor of the will. Appellants moved the court to enter judgment upon the first verdict. The court overruled the motion, and entered judgment upon the second verdict. They appeal.

The facts are these:

Minnie K. Gallagher was the widow of Jerry Gallagher; he having died late in August, 1926. They had no children. After his death she continued to live at the old home. George Kobs, who had worked for many years with her husband and was unmarried, lived with her;

also her niece Kizzie Clay Lindsey. Mrs. Gallagher had been in bad health for some years, before her husband died, of kidney trouble. This had affected her eyes so that she was practically blind. She was a sister of M. S. Burns, who was the father of Kizzie Clay Lindsey and Shirley B. Wellman. She had a sister Sophia, who lived in Missouri and was in very reduced circumstances; her husband was paralyzed. She had another sister, Mrs. Katherine Mott, who lived at Ceredo, W. Va., about 3 miles from where Mrs. Gallagher lived. In addition to this she had a number of nephews and nieces, and as they testify she was on very friendly terms with them. She had real estate of considerable value, and personal property, including stocks, of value $30,000, according to the proof for the appellants. All the property she had came to her under the will her husband, who left everything to her. M. S. Burns testified that, about three weeks after her husband's death, his sister requested him to write her will for her, telling him how she wanted it written; that he went home, wrote out the will, and about two weeks later sent it to her by his wife, Mrs. Cora Burns. He lived at Louisa, and she lived at Catlettsburg. By this will certain real property owned by her was willed to George Kobs, except her residence property, and this was willed to him for life and at his death to Shirley Wellman and Kizzie Clay Lindsey. She devised to Maud Wilson $250 and all the rest of her property she left to Shirley B. Wellman and Kizzie Clay Lindsey, share and share alike, and, if either died, the survivor took it all. He testified that when he next saw his sister she said that she was thinking about the will.

Thus things ran along until Sunday the 12th of December. That night she was taken very sick. At 4 a. m. she had a convulsion. At 8 a. m. a trained nurse came, and the doctor, who had been with her for some time, then told the nurse that she was dying. George Kobs telephoned to M. S. Burns the situation. Burns testified that he left his home at Louisa on the train at 11 a. m. and reached Catlettsburg about 12 m. He went from the train straight to the house and went to his sister's room. He asked her about the will, and she said she wanted to leave the land to Kobs without restriction and wanted the $250 paid to Maud Wilson in six months. Kobs got the will out of the drawer. He and Burns went downstairs to the sun parlor, and there Burns took a pen and crossed out of the will all the words limiting the

estate of George Kobs to his life, and added after the clause about Maud Wilson the words, "not later than six months after my decease." He and Kobs then went back upstairs together. He read the will to Mrs. Gallagher. He says that she said then, "That is just what I want." She touched the pencil, and her signature was witnessed by the doctor and the nurse, who both testify that she was then competent.

On the other hand, for the contestants it is clearly shown that they gave her morphine at 8 o'clock; that at 10 o'clock she had another convulsion; that they gave her morphine again and put her in a hot wrap, and at 12:30 she had another convulsion. At 8 o'clock she had another, and after this passed into a state of coma and died at 2 o'clock the next morning. About noon the Catholic priest was sent for. He came, he says, at 12:30. He testifies at great length as to the condition he found her in, and the substance of his testimony is that she did not know anything. According to his testimony, his visit was about the time the will was made; but, according to the testimony for the propounders, his visit was at least an hour after the will was made. Still, as the train did not get there until 12 o'clock and after this Burns went to the house and saw his sister and made the changes in the will, it could not have well been executed long before 12:30, and she had the third convulsion at 12:30. Burns, on being recalled, testified that he got to Catlettsburg at 11 a. m., but he testifies that he got to the house in not "over an hour or so," and this would place the execution of the will almost as late as 12 m. Some of the witnesses who were present testified that she said "Yes" when asked questions, while others say she did use other words. She was breathing heavily all that day. Her breathing could be heard over the house. One of her nephews came there at 10 o'clock, and Kobs saw him and told him that she was sick and they allowed nobody to see her.

Considering the evidence as to her feeble condition when this will was made, clearly there was sufficient evidence to take the case to the jury on the question of her capacity at that time. In view of the ruling of the circuit court in granting the new trial, the material question presented now is: Was there sufficient evidence of undue influence to submit this question to the jury?

Margaret Gallagher, who was a niece of her husband, testifies that nine days before she died Mrs. Galla-

gher said to her that she would commit suicide only she knew that she would never see her uncle Jerry's face if she died that way; that nobody knew what she was going through; that she said: "I haven't made a will, but I want to. I haven't been able to get one to suit me. I love all my people. I want to remember them all, especially my sister Sophia in Missouri, for she needs it more than any of them and I suppose all my people need it with the exception of uncle Milt and his daughters. I think a lot of them, but they are well provided for. Brother Milt is very wealthy. You know, Marg, 'I won't never marry. I don't know why but Milt's wife keeps asking me, 'Now, Minnie, don't sign anything.' "

Caroline Burns Meek testified that two weeks before her aunt died she was talking to her, and her aunt said that, if she did what she wanted with her money, she would like to leave it to the education of children; that her sister Sophia, who lived in Missouri, was poor and she needed the money, and she would like to leave her money where it was needed.

Maud Wilson testified that after she died George Kobs said to her that Milt Burns began to hound Min (testatrix) the next day after Jerry was buried, and that he hounded the life out of her to make a will. He said Min did not want to make a will and he did not think she was in any condition to make a will. She also testified that Kobs said to her that he was very much hurt when they limited his rights to a life estate, and that he told Mrs. Gallagher, "Well, Min, if you want to give me anything I want to get something that there was no strings tied." Another witness testifies that Kobs said that he took the will back up to her and told her that, if she did not give him anything but one of those little poodle dogs, he wanted her to give it to him without any strings on it, that she did not sign the will, and he came back downstairs and said, "Now, Milt, she hasn't signed that will and she will not sign it until you strike that out."

It is clear from the evidence that Mrs. Gallagher had had this will in her possession for over three months, and that she had taken no action upon it. It is also clear from the evidence that she was blind and feeble and entirely dependent upon those about her. When she was taken violently sick Sunday night, Kobs wired Burns to

come. Before Burns got there, the doctor had told the trained nurse who had been called in that she was dying. After this, at 10:30, she had another convulsion, and a third convulsion at 12:30. These hours are well fixed by the nurse's chart kept at the time. Though Burns went straight from the train to the house, and the first thing he did was to get his sister's instruction about the will, still, as after this he had to make the changes in the will downstairs before it was taken upstairs to her to be executed, all of this could not well have taken place much before 12:30 o'clock. Undue influence, like other things, may be shown by circumstantial evidence, and it takes much less influence to control a sick person, as feeble as Mrs. Gallagher was, than a person who is well and strong. The will is not the act of the testator, unless it is his free and voluntary act. The court cannot escape the conclusion, under all the facts, that Kobs was dissatisfied with this will as Burns by her direction had first drawn it; that, when Burns came, the first thing that he and Burns turned their attention to was this will; and that they went down together and changed the will so as to suit both of them; and that it would never have been presented to Mrs. Gallagher to sign if Burns and Kobs had not agreed down in the sun parlor upon the changes to be made. There was clear evidence showing that this was not the disposition of her property that she wished to make, if the testimony for the appellees above quoted is true. There was therefore ample evidence of undue influence to submit this issue to the jury. The finding of the jury is not against the evidence, but is amply supported by it. There was no error in the proceedings on the trial, and the verdict of the jury on the first trial should not have been set aside.

While this court is more inclined to sustain an order granting than one refusing a new trial, it will not sustain an order granting a new trial on an erroneous ground, when the verdict is warranted by the evidence and no error appears in the record, and a sound discretion was abused in granting the new trial.

Judgment reversed, and cause remanded for a judgment pursuant to the first verdict.

JUDGE WILLIS not sitting.